STATE OF LOUISIANA
v.
CLYDE MATTHEW TROSCLAIR
No. 2009 KA 2002.
Court of Appeals of Louisiana, First Circuit.
April 1, 2010.
Not Designated for Publication.
JOSEPH L. WAITZ, Jr., District Attorney and ELLEN DAIGLE DOSKEY, Assistant District Attorney Houma, Louisiana, Attorneys for Appellee State of Louisiana.
BERTHA M. HILLMAN, Louisiana Appellate Project, Thibodaux, Louisiana, Attorney for Defendant/Appellant Clyde Matthew Trosclair,
Before: PARRO, KUHN, AND McDONALD, JJ.
McDONALD, J.
Defendant, Clyde Trosclair, was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1 (Count One), and one count of attempted second degree murder, a violation of La. R.S. 14:27 and 30.1 (Count Two). Defendant entered pleas of not guilty to both counts and proceeded to trial before a jury.[1]
The jury determined defendant was guilty as charged on Count One and not guilty on Count Two. Defendant filed a Motion for New Trial and Motion for Post Verdict Judgment of Acquittal, which were both denied by the trial court. The trial court subsequently sentenced defendant to the mandatory term of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant filed a Motion to Reconsider Sentence, which also was denied by the trial court.
Defendant appeals, citing the following as error:
1. There was insufficient evidence to support the conviction. The State failed to establish that the defendant had the specific intent to kill or inflict great bodily harm in that (a) the State failed to prove that the defendant was not acting in self-defense or defense of others and the shooting was justified; and (b) defendant was too intoxicated to form the requisite specific intent.
2. In the alternative, if the court finds that there was specific intent to kill or commit great bodily harm, the defendant could only be convicted of the lesser offense of manslaughter.
We affirm defendant's conviction and sentence.

FACTS
On July 13, 2007, defendant arrived at the Dulac residence of Timmy Collins, a close friend. Defendant had obtained the day off from his job offshore. Although the exact time is not clear from the record, defendant arrived at Collins's residence during daylight, and the two began drinking beer. The two discussed going to the Uptown Sports Club in Houma to play pool later and perhaps celebrate the birthday of another friend. Mitchell Carrere and his girlfriend arrived at Collins's residence and the group visited.
Sometime after 7:00 p.m., Linzie Smith, defendant's girlfriend, and Vivian Verret, Collins's girlfriend, met the men at the Chevron Jubilee, where Collins and defendant were buying beer. The entire group then went to the residence of Mitchell Carrere's girlfriend, Jordan, where they continued visiting. Defendant and Collins left for an undetermined amount of time but returned after dark.
When Collins and defendant returned, they and Verret and Smith got into defendant's truck and traveled to the Uptown Sports Club in Houma. The group sat at a table, drinking, as they waited for a pool table to use. At some point, Verret and Smith walked to the bathroom together. As Verret passed Johnny Honeycutt, he grabbed her and said something offensive to her. Honeycutt also attempted to follow Verret into the bathroom. When Verret and Smith returned to their table, Verret told Collins about Honeycutt's actions.
Collins indicated he wanted to see Honeycutt's behavior for himself, so he told Verret to walk near Honeycutt again. Verret did so, and Honeycutt again grabbed her and said something inappropriate to her. At that point, Collins approached Honeycutt and told him to leave Verret alone. Undeterred, Honeycutt cursed at Collins and pushed him backward, causing Collins to fall and slide underneath a pool table. Before Collins could get up and retaliate, a bouncer for the bar grabbed him and threw him out.
After Collins was thrown out of the Uptown Sports Club, defendant, Verret, and Smith went outside and everyone got back into defendant's truck with Collins driving, because defendant was "a little tipsy." Collins's initial statement to the police and Verret's trial testimony indicated that Honeycutt and others followed them in a vehicle after Collins was thrown out of the Uptown Sports Club. However, defendant provided no such testimony, but instead testified that Collins wanted to go straight to his home after being thrown out of the club.
Collins drove defendant's truck back to his own residence in Dulac. This was an estimated thirty to forty-minute drive from downtown Houma. Once at Collins's residence, Collins retrieved a nine millimeter handgun, loaded it, and tried to give it to defendant. Defendant refused to take the gun, so Collins took the gun to the defendant's truck and placed it under the center console.
The group decided to return to downtown Houma with Collins driving the truck. Defendant sat in the front passenger seat and Verret and Smith sat in the back passenger seat. Smith testified she asked to go home, but instead Collins drove back to the Uptown Sports Club. According to Smith, Collins was denied entry into the club because of his earlier altercation with Honeycutt. Smith tried to convince the group to return home, but Collins drove to another bar in Houma, the Post Office Club.
Smith testified that Collins was looking for Honeycutt and eventually found him walking on a sidewalk near the Post Office Club. Collins slowly drove the truck alongside the sidewalk, and Verret yelled something out of the window at Honeycutt. Samuel Pugh, Jr., also known as "Kilo," approached the driver's side of the truck and challenged defendant to exit the truck. At that time, Honeycutt walked up to the driver's side, recognized Collins from the earlier altercation and struck him several times in the face. Defendant grabbed the gun from the console and fired two shots. Collins immediately drove the truck away, and by his own admission, ran red lights and stop signs while fleeing the scene. Defendant threw the gun into the water from an overpass.
Collins drove the truck to a Wal-Mart parking lot, and he and Verret exited the truck and called his mother to come and get them. Defendant claimed he later went to Collins's residence for a short time before leaving for work in Berwick early in the morning. Defendant was later told by his boss that he was wanted for questioning in connection with the incident, and defendant returned to Houma to turn himself in to authorities. Before defendant could reach the police station, he was apprehended by law enforcement officers.
The two shots defendant fired struck two different people. One shot struck Honeycutt and severed his aorta and windpipe, causing Honeycutt's death in a matter of seconds. The other shot struck Samuel Pugh, Sr., Kilo's father, who was standing some distance away, watching the incident. Pugh, Sr. was taken to the hospital, and was treated and released that same night.
Collins testified that he did not realize the shots were fired from the truck he was driving, but thought the shot was fired at the truck. Despite this impression, no one from the vehicle Collins was driving contacted the police. Collins testified he was struck in the face two to three times before the shots were fired, and he did not realize Honeycutt had fallen away from the truck when he drove away. Collins also testified he had no recollection of how Honeycutt was shot because he had "blacked out" due to his consumption of alcohol and pills.
Defendant testified at trial and described how he had consumed alcohol and pills (Xanibars) for several hours prior to first arriving at the Uptown Sports Club. While there, defendant claimed to have consumed at least one whiskey on the rocks and three to four shots of whiskey.
Defendant acknowledged that when Collins saw Honeycutt on the sidewalk upon their return to downtown Houma, Collins wanted to fight Honeycutt. Defendant testified that when Kilo and Honeycutt approached the truck, he was scared and he felt as if the truck were surrounded. According to defendant, Collins was seated in the driver's seat with the seat reclined, so when Honeycutt began punching him, Collins could not defend himself Defendant testified he grabbed the gun, pointed it out of the window, and fired in an attempt to scare people away.
Defendant testified that as the vehicle sped away, he was drifting in and out of sleep due to his intoxicated condition; however, he admitted to throwing the gun away because he "didn't want to [go] to jail." At no time did defendant contact the police.
The prosecution introduced a surveillance video reflecting the entire incident. In the video, a truck, identified as the truck driven by Collins, slowly moves along the street outside the Post Office Club. The truck comes to a stop and two individuals, identified as Honeycutt and Kilo, approach the truck. Within two seconds Honeycutt leans into the truck and throws a punch toward Collins. A white flash appears, Honeycutt falls away from the truck, and the truck speeds away. A total of four seconds elapse from the time Honeycutt approaches the truck until the time the flash appears.
All of the witnesses who testified indicated they never saw Honeycutt with a weapon.

SUFFICIENCY OF THE EVIDENCE
In his first assignment of error, defendant argues the evidence used to support his conviction is insufficient. Defendant presents a two-prong argument, first that he was acting in self-defense and the defense of others, and the shooting was justified. Second, defendant argues he was too intoxicated to form the specific intent necessary to commit second degree murder.
The standard of review for the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); La. Code Crim. P. art. 821(B). In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," in order to convict, every reasonable hypothesis of innocence is excluded. State v. Wright, 98-0601, p. 2 (La. App. 1 Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157, and XXXX-XXXX (La. 11/17/00), 773 So.2d 732 (quoting La. R.S. 15:438). This standard of review, in particular the requirement that the evidence be viewed in the light most favorable to the prosecution, obliges the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. The reviewing court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Corkern, XXXX-XXXX, pp. 2-3 (La. App. 1 Cir. 9/17/04), 897 So.2d 57, 59-60, writ denied, 2004-2627 (La. 2/18/05), 896 So.2d 29.
Second degree murder is defined in pertinent part as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is the state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be proved by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. State v. Herron, 2003-2304, p. 4 (La. App. 1 Cir. 5/14/04), 879 So.2d 778, 782. It has long been recognized that specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Hoffman, 98-3118, p. 48 (La. 4/11/00), 768 So.2d 542, 585, opinion supplemented by XXXX-XXXX (La. 6/14/00), 768 So.2d 592 (per curiam), cert, denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).

Justification Defense
In the first portion of this assignment of error, defendant maintains he was acting in self-defense and the defense of others, and therefore lacked the requisite intent to kill required as an element of second degree murder.
When a defendant claims self-defense in a homicide case, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. See State v. Fisher, 95-0430, p. 3 (La. App. 1 Cir. 5/10/96), 673 So.2d 721, 723, writ denied, 96-1412 (La. 11/1/96), 681 So.2d 1259. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(1); State v. Lilly, 552 So.2d 1036, 1039 (La. App. 1 Cir. 1989). It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is necessary to protect the other person. La. R.S. 14:22.
However, La. R.S. 14:21 provides that a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the confict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw from and discontinue the conflict. For appellate purposes, the standard of review of a claim of self-defense is whether a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that the homicide was not committed in self-defense or the defense of others. See State v. Lilly, 552 So.2d at 1039.
In the present case, although Collins was involved in an earlier altercation with Honeycutt, it is apparent that at least an hour elapsed from the time he and defendant left downtown Houma, retrieved a weapon from Collins's Dulac residence, and returned to downtown Houma. Although there was testimony that the group may have been followed after initially leaving downtown Houma, at no time did defendant or anyone in the vehicle contact the police. Both defendant and Smith testified that after Collins retrieved his weapon, he was looking for Honeycutt so he could fight him. Evidence established that Collins even attempted to reenter the Uptown Sports Club. The surveillance video reflects Collins driving defendant's truck slower than traffic, evidence indicative that at least Collins was looking for someone. Given the circumstances, it was reasonable to conclude that Collins was acting as the aggressor. Moreover, the surveillance video contradicts defendant's testimony that he was fearful when Honeycutt and Kilo approached the truck because the truck was surrounded by a crowd. Rather, the video reflects only two individuals approaching the truck. Although the video reflects Honeycutt throwing at least one punch towards Collins, there was no vehicle blocking the pathway of the truck. Further, the time sequence indicates only four seconds elapsed from the time Honeycutt threw a punch until the flash of the weapon being discharged is seen.
Finally, the evidence established defendant disposed of the weapon and failed to contact the police about the incident before leaving a few hours later for his offshore job near Berwick. Although an individual's flight does not in and of itself indicate guilt, it can be considered as circumstantial evidence that the individual has committed a crime. Flight shows consciousness of guilt, and is one of the circumstances from which guilt may be inferred. State v. Williams, 610 So.2d 991, 998 (La. App. 1 Cir. 1992), writ denied, 617 So.2d 930 (La. 1993). Moreover, "lying" has been recognized as indicative of an awareness of wrongdoing. State v. Alpaugh, 568 So.2d 1379, 1384 (La. App. 1 Cir. 1990), writ denied. 572 So.2d 65 (La. 1991).
It is well-settled that the trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, the matter is one of the weight of the evidence, not its sufficiency. The reviewing court must defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. State v. Fisher, 95-0430 at pp. 4-5, 673 So.2d at 724.
Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have concluded that the defendant possessed the specific intent to kill and did not act in self-defense or in defense of others. Rather, viewing the evidence in the light most favorable to the prosecution, it appears following the initial confrontation between Collins and Honeycutt, Collins returned to his residence and retrieved a weapon. After arming himself, of which defendant was aware, Collins and defendant returned to Houma to search for Honeycutt. Once Collins located Honeycutt, he initiated another confrontation. Defendant, aware of the loaded weapon in the truck, fired two shots within seconds of Honeycutt walking over to the truck. Under these circumstances, the jury's rejection of the justification defense presented by defendant was reasonable.
This portion of the assignment of error is without merit.

Intoxication Defense
In the second argument presented under this assignment of error, defendant maintains he was too intoxicated to form the specific intent necessary to commit second degree murder.
Defendant argues that on the day of this incident, he began drinking at approximately 10:00 a.m. Defendant claims he consumed beer and ingested Xanibars all day until he went to the Uptown Sports Club sometime after dark. After arriving at the Uptown Sports Club, defendant testified he consumed at least one glass of whiskey on the rocks and three to four straight shots of whiskey. Defendant claimed as evidence of his highly intoxicated state, he was periodically passing out as Collins drove the truck from downtown Houma to Dulac and back, and away from the scene of the shooting.
Intoxication is a defense to a prosecution for second degree murder if the circumstances indicate the intoxication, whether voluntary or involuntary, precludes the presence of specific criminal intent. See La. R.S. 14:15(2). When defenses that could defeat an essential element of an offense, such as intoxication, are raised by the evidence, the State must overcome the defense by evidence that proves beyond a reasonable doubt that the mental element was present despite the alleged intoxication. State v. Lutcher, 96-2378, pp. 17-18 (La. App. 1 Cir. 9/19/97), 700 So.2d 961, 973, writ denied, 97-2537 (La. 2/6/98), 709 So.2d 731.
Again, we note that despite defendant's claim of intoxication, defendant admits to disposing of the weapon immediately following the shooting. Such an act is indicative of guilty knowledge and negates the argument that defendant was too intoxicated to possess the requisite intent as required to satisfy the elements of second degree murder.
Viewing the evidence in the light most favorable to the prosecution, we find the evidence presented was sufficient for a rational juror to conclude beyond a reasonable doubt that the State proved the existence of specific intent despite defendant's consumption of alcohol and drugs.
This portion of the assignment of error is without merit.

MANSLAUGHTER
In an alternative assignment of error, defendant argues that if this Court finds he had the specific intent to kill or inflict great bodily harm, he should only be convicted of the lesser included offense of manslaughter.
According to La. R.S. 14:31(A)(1), manslaughter is a homicide which would otherwise be a first or second degree murder, but is "committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." However, "[p]rovocation shall not reduce a homicide to manslaughter if the [factfinder] finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]" State v. Leboeuf, XXXX-XXXX, p. 5 (La. App. 1 Cir. 9/15/06), 943 So.2d 1134, 1138, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158.
"Sudden passion" and "heat of blood" are thus not, properly speaking, elements of the offense of manslaughter; rather, they are mitigatory factors, in the nature of a defense, which tend to lessen the degree of culpability of the homicide. The State does not bear the burden of proving the absence of these mitigatory factors. A defendant who establishes by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" is entitled to a verdict of manslaughter. State v. Leboeuf, XXXX-XXXX at p. 5, 943 So.2d at 1138. Provocation is a question of fact to be determined by the trier of fact. Thus, the issue remaining is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. State v. Corkem, XXXX-XXXX at p. 7, 897 So.2d at 63.
In the instant case, the guilty verdict indicates the jury concluded this was a case of second degree murder and rejected the possibility of a manslaughter verdict. The jury obviously concluded that the circumstances of the shooting did not equate to sufficient provocation to deprive an average person of self-control and cool reflection, and thus, mitigating factors, which would reduce the degree of homicide from murder to manslaughter, were not established by a preponderance of the evidence in this case. We find no error in this conclusion.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Defendant was originally charged in Count One with first degree murder; however, the charging instrument was amended on March 20, 2008, to reflect the charge of second degree murder.